2022 IL App (1st) 181293-U

SECOND DIVISION
June 14, 2022

No. 1-18-1293

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 10 CR 22162 |
| | ) | |
| NORBERTO RODRIGUEZ, | ) | The Honorable |
| | ) | Luciano Panici, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

*HELD*: Defendant's convictions affirmed where the evidence, though primarily circumstantial, was sufficient to prove him guilty beyond a reasonable doubt; the trial court did not err by allowing evidence of a prior incident between defendant and the victim and of information related to the victim's funeral; the trial court did not err in allowing evidence from defendant's credit report; the State's closing argument did not deny defendant a fair trial; a *Frye* hearing was not required for the admission of historical cell site analysis testimony; and there was no cumulative error warranting reversal and remand.

¶ 1        Following a jury trial, defendant-appellant Norberto Rodriguez (defendant) was convicted of first-degree murder and concealment of a homicidal death. He was sentenced to 60 years for the murder convictions and 5 years for the concealment conviction, to run consecutively, for a total of 65 years in prison. He appeals, presenting six contentions for our review: (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt; (2) the trial court erroneously allowed inflammatory and prejudicial evidence to demonstrate that he had poor character; (3) the trial court erroneously allowed inadmissible hearsay evidence in the form a his credit report; (4) he was denied a fair trial as a result of the State's improper remarks during closing argument; (5) the trial court erred in allowing historical cell site analysis evidence without first conducting a *Frye* hearing; and (6) all these errors resulted in cumulative error. He asks that we reverse his conviction outright, or, alternatively, that we reverse and remand for a new trial, or, again alternatively, that we retain jurisdiction and remand for a *Frye* hearing on the general acceptance of historical cell site analysis. For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3        Defendant was charged in connection with the murder of his wife, Irma Rodriguez, after her children reported her missing on the evening of May 31, 2009. The next day, police found Irma's body in the trunk of her car at 148th Street and Kilpatrick Avenue in Midlothian, three miles from the family home. There was a bullet hole in her shirt and blood visible on the back of her head, as well as blood stains on the trunk's carpet; she had been shot in the back and head. Her manner of death was homicide. Defendant was arrested in

November 2010 at which time he was approximately six feet tall and weighed about 200 pounds.

¶ 4    Prior to trial, in anticipation of the admission into evidence of certain historical cell site analysis and testimony, defendant filed multiple motions. One was a motion *in limine* precluding the State from introducing evidence that on the night of Irma's disappearance, defendant's cell phone "ping[ed]" off a cell tower located near where her body was found, arguing that this would unfairly prejudice him. The trial court denied the motion. Another of defendant's pretrial motions in this regard sought a *Frye* hearing on the admissibility of expert testimony, to be provided by FBI special agent Joseph Raschke, regarding the historical cell site analysis he performed in this case. Defendant argued such analysis was not generally accepted in the relevant scientific community and pointed to a federal court case where agent Raschke's methodology had been found to be unreliable. The trial court denied this motion as well and declined to hold a *Frye* hearing, stating that the federal case was inapplicable due to the differing standards between federal and Illinois state law regarding the reliability and admissibility of evidence. The court further commented it had recently presided over a triple murder case "where the same issue was brought up, and [the same motion] was denied." The trial court declared that the proposed evidence is "an accepted scientific theory in the community; and, therefore, there need not be any *Frye* hearing to determine whether or not, because it's not novel, to determine whether or not it's admissible."

¶ 5    At trial, Monica Medina, Irma's daughter, testified that Irma married defendant when she (Monica) was very young. They lived together, along with defendant and Irma's son Gabriel

(Monica's step-brother), in the family home in Oak Forest. In 2008, Monica, Irma and Gabriel moved out and lived with Irma's eldest son (Monica's brother), Martin Medina, Jr., in his apartment, as Irma separated from defendant. However, by early 2009, they moved back in with defendant and defendant's mother, Carmen (who was mentally disabled and could not be left alone), at the Oak Forest home. According to Monica, Irma and defendant fought almost every other day and there was much tension in the house, centered on defendant's concern that Irma would leave him. Monica testified that on the morning of May 31, 2009, Irma took Gabriel and her to church, out to lunch, and then dropped Monica off at Monica's boyfriend's house. Monica returned home at approximately 8:10 p.m. She entered through the garage by using a keypad and then through the service door inside the garage leading into the home. She knew Irma drove a white Pontiac Grand Am with the personalized license plate TITA 6. That car was not in the garage when she returned home. However, Carmen's red Kia, which defendant drove, was in the garage. Monica went straight downstairs to study for her exams.

¶ 6      Monica testified that soon thereafter, she received a cell phone call from Gabriel asking her to open the service door. When she opened the door, Gabriel was standing in the garage holding Irma's purse, which Irma had been carrying that day; he asked Monica why Irma's purse was on the floor in the garage. They looked around and saw that Irma's sandals were also on the garage floor. At this point, Monica and Gabriel walked through the house. There were no broken windows or doors. However, they noticed that there was no one home except Carmen, who was alone and asleep in her room, and there was food on the stove in the kitchen. Monica and Gabriel each used their cell phones to call Irma's cell phone multiple

4

times, but Irma did not answer and their calls went straight to her voicemail. Monica also called John Avolio, whom she knew was Irma's boyfriend, and then she called her own boyfriend with whom she had been earlier that day.

¶ 7 Monica further testified that about 45 minutes later, she saw defendant approaching the house. She and Gabriel locked the front glass storm door so defendant could not enter, but left the wooden door open so they could see him. They asked defendant where Irma was, and he responded that he did not know. They then asked him where he had been, and he responded that he had gone for a walk. Monica stated that in all the time she has known defendant, she has never known him to go for a walk. Monica averred that her boyfriend then arrived, whereupon she opened the door and pushed past defendant to get to her boyfriend's car. Gabriel followed, and they discussed the situation with Monica's boyfriend. While they were talking, defendant went over to the group and told them they should go to Irma's friend's house to see if she was there. Monica's boyfriend drove her and Gabriel to the general area where Monica remembered Irma's friend lived, but Monica did not know the exact address. They did not see Irma or her car in that area, and they continued unsuccessfully to reach Irma on her cell phone until they eventually returned home.

¶ 8 Finally, Monica testified briefly with respect to an incident that happened on October 17, 1997, when she was very young and living with Irma, defendant and Gabriel, who was a baby, in a home in Chicago. Monica recalled that Irma and defendant were in their bedroom with the door closed, arguing. The fighting escalated, whereupon Monica heard a loud noise and saw her mother run out of the bedroom and out the front door. Moments later, defendant came out of the bedroom and asked Monica which way Irma went. Audio of two 9-1-1 calls

made on that date were published to the jury. Monica identified the voices on the calls as belonging to Irma and defendant. Monica averred that Irma can be heard stating that defendant, her husband, is a Chicago police officer and that he should go get the gun; Monica also averred that defendant can be heard saying, presumably to Irma, that she (Irma) is bleeding. Monica agreed that defendant was a Chicago police officer at that time, but he was no longer one after that incident. Monica did not know the circumstances of the argument and did not see the argument itself. Following police intervention and investigation, it was discovered that during that incident, defendant had shot Irma in the hand.

¶ 9   Gabriel corroborated much of Monica's testimony. He stated that when he, Monica and Irma moved back in with defendant in January 2009 after his parents' year-long separation, everything seemed normal at first, but soon defendant and Irma returned to their pattern of repeatedly arguing; they did not sleep in the same room and they did not do anything as a couple. On May 31, 2009, Irma took Monica and him to church, to lunch, and then dropped Monica off at her boyfriend's house. Irma and Gabriel eventually returned home, and defendant was there. At about 4:00 p.m., Gabriel asked Irma if she could drive him to his friend's residence near 147th Street and Kilpatrick Avenue in Midlothian, which she did. Gabriel averred that defendant was coming in and out of the garage at the time of this conversation, while he and Irma were in the house; Gabriel also averred that defendant knew where his friend lived, as defendant had driven Gabriel there before.

¶ 10   Gabriel testified that, as Irma was getting ready to drive him, defendant and Carmen left the house in Carmen's red Kia. Later that evening, a friend dropped Gabriel off at home around 8:15 p.m. and Gabriel used the keypad to open the garage door. The only car in the

garage was the red Kia. As he approached the service door, he noticed Irma's purse next to the door, along with her sandals. He picked up the purse and, when he found the service door locked, he called Monica to let him in. He and Monica then looked through the house; almost all the lights were off, but there was prepared food on the stove, Carmen was home alone, and no one else was there. Gabriel found these things to be unusual, as the house rule was Carmen was never to be left alone due to her mental illness, and Irma never left food out on the stove. Gabriel called Irma's cell phone numerous times; it would ring and eventually just went to voicemail. He also called defendant's cell phone; it went straight to voicemail.

¶ 11        Gabriel further testified that at about 9:15 p.m., he saw defendant approaching the house, walking up the driveway to the front door. Gabriel immediately locked the glass storm door but left the wooden door open so he could see defendant. As Monica joined him by the door, Gabriel repeatedly asked defendant where Irma was, and defendant, after looking around, responded that he did not know and that he had been out on a walk at the park. Gabriel averred that in his whole life, he had never known defendant to go for a walk. Monica's boyfriend then arrived and Monica opened the door to meet him. Gabriel continued to question defendant, who went into the garage, grabbed Irma's sandals and took them inside. Gabriel went to speak with Monica and her boyfriend in the driveway, whereupon defendant came back outside and told the group they should go check for Irma at her friend's house. The group did so, but did not see Irma or her car anywhere in the area. They returned home and Gabriel went inside; Gabriel noted that defendant was in the shower. Gabriel further testified that he found his backpack, which he had been keeping in the trunk of Irma's car that day, now in the basement of the house behind some couches.

¶ 12    Officer Hoffman[1] testified briefly with respect to the October 17, 1997 incident. On that date, he and his fellow officers responded to a domestic violence call involving Irma and defendant at their home in Chicago. When officer Hoffman arrived, he saw defendant on the sidewalk coming from a yard between some houses. He had blood on his hands and he was holding a bloody gun. Officer Hoffman told defendant he was under arrest, whereupon defendant informed officer Hoffman that he was a Chicago police officer. Despite some resistance on defendant's part, officer Hoffman took defendant into custody.

¶ 13    Carmen Halim, Irma's sister, testified with respect to Irma's relationship with defendant. She stated that after the October 17, 1997 incident, Irma decided not to follow through with the prosecution against defendant.[2] She also stated that while defendant had been a Chicago police officer, he was no longer employed as such after the incident. Halim often spoke to Irma when Irma had arguments with defendant, and she last saw Irma about a week before her disappearance, at which time Irma told her she was excited because she was going to move out of the Oak Forest home. Halim further testified, upon defendant's objection, that she, her other sister and their mother planned Irma's funeral, and defendant did not help with the planning of, pay for, or attend Irma's funeral.

¶ 14    Martin Medina, Jr., Irma's eldest son, testified that he did not live with Irma and defendant in 2009. However, on May 31, he had a conversation with Irma on her cell phone at about 6:30 p.m. It lasted about eight minutes, and that was the last time he spoke to her.

---

[1] Officer Hoffman's first name is not included in the record.
[2] The record shows that the State charged defendant in connection with the October 17, 1997 incident and that he was eventually acquitted.

¶ 15       John Avolio testified that he met Irma in 2005 at the hospital where they worked, and by 2007, they began an intimate relationship. Irma told him she was getting a divorce. He described that one day in 2008, Irma waited for defendant to go to work and she packed her things and moved into an apartment with her children, where she stayed for about a year. John testified that he and Irma eventually ended their relationship when she wanted them to move in together but he did not. They began speaking again in early 2009, and Irma told Avolio that she had moved back in with defendant at the Oak Forest home. Soon thereafter, Avolio and Irma renewed their intimate relationship. He testified that a week before her disappearance, Irma went to his home and gave him $4,000, which she owed him. He and Irma had made plans to buy a house together once Irma divorced defendant; they had hired a realtor and found a house, and Avolio told Irma he would put the money she gave him toward the purchase. Avolio further testified that on the afternoon of May 31, 2009, he was at the gym. At about 3:00 p.m., he was walking to his car to leave when he saw Irma walking from her car and approaching him; they had not planned to meet. Avolio averred that Irma was in a very good mood and they planned to meet at 1:00 a.m. the next morning, after his late shift at the hospital. He did not see Irma again. Later that evening while he was working,[3] he received a call from Monica asking if Irma was with him. Avolio stated that neither he nor Irma ever hid their relationship, and he never met defendant in person.

¶ 16       Carmen Quinones, an attorney specializing in family law and divorce, testified that Irma became her client in 2007, when Quinones filed a petition on her behalf to divorce defendant.

---

[3] Stipulated testimony from Avolio's emergency room department supervisor and hospital surveillance video presented at trial established that Avolio's shift was from 4:00 p m. on May 31, 2009 to 12:30 a m. on June 1, 2009, and that he was present and accounted for during that entire time.

As defendant chose to represent himself, Quinones met with him and Irma after he was served to attempt settlement. This did not occur. Eventually, Irma asked Quinones to put the divorce on hold. Quinones testified that she then met with Irma on May 27, 2009, a few days before her disappearance. Quinones averred that Irma expressed her desire to renew the divorce proceedings and, a couple days after their meeting, Quinones returned to court for her in order to do so. She did not speak to Irma after their meeting.

¶ 17     Officer Daren Lorek testified that on May 31, 2009, he responded to a call at the Oak Forest home from Monica and Gabriel, who reported Irma as a missing person. When he arrived, he saw defendant standing alone outside the home smoking a cigarette. After he relayed to defendant Monica and Gabriel's report, defendant told officer Lorek he was concerned about Irma's whereabouts as well, as it was unusual for her not to be home at this time in the evening. Officer Lorek stated that, when he asked defendant where he had been, defendant told him he had taken his mother shopping in Chicago at 3:30 p.m. and returned home at 7:30 p.m., whereupon he noticed that neither Irma nor her car were at the house, but her purse was inside the house. Defendant also told officer Lorek he called Irma's cell phone numerous times but she did not answer. Defendant then recounted that after he arrived home, he went for a walk because he had gotten into an argument with Carmen and, though he admitted he was having marital problems with Irma, he stated that these were related to Carmen living with them. Officer Lorek further testified that defendant allowed him to enter the home. Officer Lorek observed it to be orderly, with no signs of wrongdoing; he saw Irma's purse and took it into evidence.

¶ 18    Sergeant John Daley testified that he was assigned to look for Irma's white Grand Am. The car was found on June 1, 2009 on Kilpatrick Avenue between 147th and 148th Streets in Midlothian, just south of Gabriel's friend's home, parked on the street in front of a fence line near apartment buildings. Sergeant Daley testified that the keys, which had been found in a different location, were brought to the scene. Police opened the trunk, revealing a body that was later identified as Irma.

¶ 19    Police detective Richard Belcher testified that on June 1, 2009, he was assisting in Irma's missing person investigation. At the outset, he learned she was married to defendant and that both of them had cell phones, so he executed an exigent circumstances request to their providers for incoming and outgoing calls and cell tower locations. Soon, Irma's car was discovered with her body in the trunk; detective Belcher did not observe any indication that the car had been stolen and noted that it was only three miles from the Oak Forest home. Bank records were also obtained from Bank of America regarding multiple accounts shared by Irma and Carmen. Detective Belcher averred that, upon his examination, he saw almost weekly withdrawals from one account in increments between $300 and $500 from different ATMs. In conjunction with video surveillance, he noted that on May 31, 2009, a withdrawal was made from someone in a small maroon car, which detective Belcher stated appeared to be a Kia, at 5:52 p.m. from an ATM in Berwyn.[4]

¶ 20    Detective Belcher further testified that he examined the contents of Irma's purse recovered by officer Lorek and found two newspaper articles dated October 19, 1997 about defendant and Irma's prior shooting incident, a receipt from Burlington Coat Factory dated

---

[4] The video surveillance footage of the transaction was played in court during detective Belcher's testimony; however, he admitted that it did not clearly show the model of the maroon car, its license plate, or its occupant(s).

May 31, 2009, and an ATM receipt also dated May 31, 2009, showing a $40 withdrawal. He noted that this ATM receipt had a different account number than the debit card transaction at the Berwyn ATM that occurred on the same day. Detective Belcher examined the purse again later and found a Bank of America ATM card inside with Irma's name on it. He stated that, upon further investigation, he discovered two electronic withdrawals made from that account, one in the amount of $1,000 and another in the amount of $3,000 ($4,000 total), both conducted on May 26, 2009 within a minute of each other at the Berwyn ATM location. Detective Belcher further testified that he drove the route from the Berwyn ATM to the Oak Forest home twice as part of his investigation, both times on a Sunday[5] beginning at 5:52 p.m., and the trip took him between 38 and 40 minutes.

¶ 21    Michael Scanlon testified that on May 31, 2009, he was at his home on Kostner Avenue in Midlothian. At about 7:00 p.m., he was watching television while sitting in a chair next to his picture window when he noticed a car pull up and park on the street in front of his home. Scanlon stated that he saw a man get out, walk around to the trunk of the car, stare at it for a moment, reach over and touch or rub/wipe it, then reenter the car and drive away. Scanlon testified that the car was a white Pontiac Grand Am or Trans Am, and it was not one common to the neighborhood; he did not notice the car's license plate. He described the man as tall, thin and Hispanic. Some days later, when he heard and saw news reports of Irma's missing car, which was found only two blocks west of his home, he recognized it as the car he had seen the day she disappeared and he called police.

_____

[5] May 31, 2009, the day of Irma's death, was a Sunday.

¶ 22     Additional police officers, a crime scene investigator, an assistant medical examiner, and various forensic personnel testified to the following. Briefly, in addition to the blood in Irma's hair, blood stains on her body and in the carpet of the trunk, and the bullet hole in her shirt, there was a blood-like stain on the car's bumper with a single hair in it. Inside the garage at the family home in Oak Forest, a clump of human hair was found on the cement floor, accompanied by blood stains and bullet fragments; there were also little blood stains in two other areas on the garage floor. Irma's body had two bullet holes and two graze wounds; two bullets were recovered from her body. It was determined that these two bullets and the bullet fragments recovered from the garage floor were fired from the same firearm.

¶ 23     Following a hearsay objection raised by defendant regarding the admissibility of credit reports obtained from TransUnion, and the trial court's overruling of that objection, Richard Orlowski, a senior consultant of litigation from TransUnion, testified with respect to defendant's credit report prepared on December 23, 2009. While detailing the multi-page report, Orlowski identified several accounts belonging to defendant showing they were in collections status, a tax lien, and a Chapter 7 bankruptcy. He also identified other accounts in the report, some of which were in good standing, others which were not in good standing, and others that had been closed, paid or reported stolen. Orlowski admitted that TransUnion does not create records such as these but only collects information from other companies, and he could not ensure that those companies reported information correctly.

¶ 24     Roxanne Hollingsworth, a court appearance operations analyst for Bank of America, testified with respect to the bank's record-keeping of checking and savings accounts, as well as the recording of ATM transactions on customer accounts. She then testified specifically

about records related to multiple Bank of America accounts held jointly by Irma and Carmen. Hollingsworth noted that in one account, a money market, there was a balance of $12,899.91 in January 2009, but by May 20, 2009, the balance was $5,504.34. She also noted that on May 26, 2009, there were two transactions: a withdrawal from a savings account in the amount of $1,000, and a transfer from that account into a checking account in the amount of $3,000. She further confirmed a withdrawal at 5:52 p.m. on May 31, 2009 in the amount of $500 from an ATM in Berwyn. Hollingsworth averred that the records of the withdrawals do not specify who made them.

¶ 25        Ricardo Leal, a records custodian and subpoena analyst for Sprint Telecommunications Corporation, testified that pursuant to subpoena, subscriber information and a 2009 cell tower site location list for defendant's cell phone were prepared, noting that these provided records of calls made to and from defendant's cell phone and identified the location of the towers that were utilized for those calls; Leal testified only with respect to defendant's call records. He identified several calls from May 31, 2009: outgoing calls at 12:07 p.m., 1:58 p.m., 5:12 p.m., and 11:43 p.m., along with a call made at 7:55 a.m. on June 1; an incoming call at 8:29 p.m. that went to voicemail; and a direct connection that took place at 6:49 p.m. and lasted 10.5 seconds. Admittedly, the records could not identify who was using the phone at those times. Solangia Haddock, a subpoena specialist from U.S. Cellular, similarly testified that pursuant to subpoena, subscriber information and a 2009 cell tower site location list for Irma's cell phone were prepared. With respect to calls made to and from Irma's phone on May 31, 2009, she identified an outgoing call at 10:56 a.m.; incoming calls at 12:06 p.m., 12:13 p.m., 12:35 p.m., and 12:44 p.m.; outgoing calls at 12:54 p.m., 12:57 p.m., and 6:02

p.m.; an incoming call at 6:30 p.m.; several short-duration incoming calls around 8:30-9:30 p.m. consistent with going to voicemail; and several other short calls from 11:00 p.m. to midnight. She also identified an incoming call on June 1, 2009 at 7:54 a.m.

¶ 26    Upon defendant's objection, and consistent with the trial court's pretrial rulings, FBI special agent Raschke, assigned to the bureau's Cellular Analysis Survey Team, was qualified and testified as an expert in the field of historical cell site analysis. He explained that he performed a historical cell site analysis with respect to Irma's and defendant's cell phone numbers, based on call records and 2009 cell tower site location lists from Sprint and U.S. Cellular. He described that his analysis of this information would show simply in what general area these cell phones would have been at a particular time in relation to certain cell towers.

¶ 27    First, agent Raschke testified generally with respect to how cellular networks function and the records that are generated. Briefly, he explained that when a cell phone makes or receives a call, the phone "communicates with a cell tower" that has "radio frequency transmitters and receivers," which are just pieces of equipment that connect to the actual cellular network, enabling the phone to work. When a cell phone is on, it is scanning the radio frequency environment, measuring signals from cell towers (and even different sides of these towers), located in several surrounding areas to "always use the strongest, clearest signal" it is receiving, as cell phones are programmed to do to ensure the best call quality. According to agent Raschke, the strongest, clearest signal "generally comes from the tower that the phone is closest to." He then clearly reiterated that his analysis would not be able to pinpoint a phone's exact location or specific address at the time of use, but would only be

able to show that a phone "was in the general area covered by" a certain tower at a particular time.

¶ 28    Next, agent Raschke testified specifically with respect to his analysis of Irma's and defendant's cell phones for May 31 to June 1, 2009. As to Irma's phone, agent Raschke noted that it used a cell site at 5:12 p.m. and 6:30 p.m. that was less than a half mile from the Oak Forest home. As to defendant's phone, agent Raschke noted that at 1:58 p.m., it used a cell tower near the Oak Forest home; at 4:50 p.m., it used a tower located at I-55 and Kedzie Avenue near Chicago; at 5:12 p.m., it used a tower on North Avenue west of Kedzie Avenue on the north side of Chicago; and at 6:49 p.m., it used a tower less than a mile west of the Oak Forest home. The 8:29 p.m. call to defendant's phone that went to voicemail used a tower consistent with being east or northeast of the Oak Forest home, consistent with the direction where Irma's car was found from the home, and inconsistent with the direction of the home itself, which was west. And, there were multiple calls between 9:46 p.m. and 11:28 p.m. which used a cell tower consistent with the location of the Oak Forest home. Agent Raschke also noted that there were some attempted incoming calls made to Irma's cell phone after 6:30 p.m. with no cell site listing, which he explained indicated that her phone was off-network, meaning it could have been powered off, the battery died, it was broken or there was simply no signal.

¶ 29    Agent Raschke concluded his testimony by further explaining, again, that his analysis only showed the tower or tower sector used by Irma's and defendants' cell phones at certain times, and he could not say that a particular cell phone was at an exact address at those times. He also noted for the jury that, while cell phones will always use the strongest, clearest

16

signal, and while the general rule is that this usually comes from the tower that the phone is closest to, there are some exceptions. For example, he described instances in which the closest cell tower to a phone may become overloaded or is not operating properly; the phone may then seek a signal from a different, unobstructed tower nearby. Agent Raschke averred he did not check the 2009 maintenance records for the towers at issue, and he did not check the area for any obstructions to those cell towers.

¶ 30    Following closing argument,[6] the jury found defendant guilty of first-degree murder and concealment of a homicidal death, and that he personally discharged a firearm that proximately caused death to another. He was sentenced consecutively, for a total of 65 years in prison.

¶ 31                                ANALYSIS

¶ 32    Defendant presents six contentions for review. We address each separately.

¶ 33                        I. Sufficiency of the Evidence

¶ 34    Defendant's first contention is that the evidence presented against him at trial was insufficient to prove him guilty beyond a reasonable doubt, warranting the outright reversal of his conviction. Citing a lack of direct evidence, including eyewitnesses or forensic evidence, the inability of cell phone evidence to specifically place him in a particular location at a particular time, and that the state of his marriage and finances did not actually suggest a motive, he insists that the State presented, at best, a "weak circumstantial case[] which merely established that [he] might be guilty," and, accordingly, this "did not permit the jury

---

[6] The propriety of several comments made by the State during closing argument form the basis of one of defendant's contentions on appeal. Due to the length of closing arguments and the variety of topics they addressed, we chose not to present those individual comments here. Rather, we will do so in more detail below when we address the issue surrounding their propriety.

to rationally conclude that there was no reasonable doubt as to his guilt." Based on our review of the record, we disagree.

¶ 35 At the outset, we note that defendant devotes a good portion of his brief asserting that *Jackson v. Virginia*, 443 U.S. 307 (1979), requires *de novo* review of his contention since it amounts to "a question of law, not fact." This most certainly is not the case here. While he couches his claim in terms of rationality and posits that this Court owes no deference to the jury's determination of guilt, the underlying essence of defendant's argument is obvious: it is, plainly and simply, a challenge to the sufficiency of the evidence used to convict him. Contrary to defendant's assertion, our standard of review does not change depending on the type of evidence presented—direct, circumstantial, or whatever combination it may have been. Rather, our standard of review is clear, and we reiterate it now as we review defendant's claim.

¶ 36 When a criminal defendant challenges the sufficiency of the evidence used to convict him, the standard of review is whether, when viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *People v. Smith*, 185 Ill. 2d 532, 542 (1999); *People v. Hunley*, 313 Ill. App. 3d 16, 20 (2000); see also *Jackson*, 443 U.S. at 319. Courts of appeal will not retry the defendant. See *People v. Digirolamo*, 179 Ill. 2d 24, 43 (1997). Instead, the jury, as the trier of fact in the instant trial, hears and sees the witnesses and, thus, has the responsibility to adjudge their credibility, resolve any inconsistencies, determine the weight to afford their testimony and draw reasonable inferences from all the evidence presented. See *People v. Steidl*, 142 Ill. 2d 204, 226 (1991); *Hunley*, 313 Ill. App. 3d at 21. Ultimately,

a conviction will not be overturned unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of guilt. See *People v. Maggette*, 195 Ill. 2d 336, 353 (2001); *People v. Brown*, 185 Ill. 2d 229, 247 (1998). "[T]his standard of review applies in all criminal cases, whether the evidence is direct or circumstantial." *Maggette*, 195 Ill. 2d at 353; see *People v. Gilliam*, 172 Ill. 2d 484, 515 (1996), and *People v. Pintos*, 133 Ill. 2d 286, 291 (1989) (stating same).

¶ 37    Defendant is correct in noting there is a difference between circumstantial and direct evidence. However, and undoubtedly, our courts have made abundantly clear that circumstantial evidence is, indeed, sufficient to sustain a criminal conviction; it is not any less viable or valid. See *Maggette*, 195 Ill. 2d at 353; *Gilliam*, 172 Ill. 2d at 515. Rather, just as with direct evidence, as long as circumstantial evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged, namely, the *corpus delicti* (here, the fact of death and the fact that the death was through criminal agency) and that the crime was committed by the person charged, it is sufficient to sustain a conviction. See *People v. Hall*, 194 Ill. 2d 305, 330 (2000); *People v. McVay*, 2019 IL App (3d) 150821, ¶ 40. Moreover, it is also undisputed that, in circumstantial evidence cases, a jury is not required to accept any or every possible explanation compatible with defendant's innocence and elevate it to the status of reasonable doubt. See *People v. Cline*, 2022 IL 126383, ¶ 34; accord *Gilliam*, 172 Ill. 2d at 515-16, citing *People v. Herrett*, 137 Ill. 2d 195, 206 (1990). In other words, the jury does not need to be satisfied beyond a reasonable doubt as to each link in the chain of circumstances but, rather, that all the circumstantial evidence, taken together, satisfies it

beyond a reasonable doubt of the defendant's guilt. See *Hall*, 194 Ill. 2d at 330; *McVay*, 2019 IL App (3d) 150821, ¶ 40; accord *People v. Scott*, 2020 IL App (1st) 180200, ¶ 39.

¶ 38     In the instant case, we find, based on the record before us, that the circumstantial evidence presented was more than sufficient to prove defendant's guilt beyond a reasonable doubt.

¶ 39     Defendant admits in his brief on appeal that there is no question Irma died and that her death was a homicide. This leaves, then, a burden on the State to prove defendant committed that homicide beyond a reasonable doubt. The State's theory of the case was that Irma, who had a turbulent relationship with defendant for many years, finally decided to leave him and take with her much of the couple's funds; when defendant discovered this, he killed her in the garage of the Oak Forest home, put her body in the trunk of her car and drove it to the last place he knew she had been outside the home that day, Gabriel's friend's house near 148th Street and Kilpatrick Avenue, whereupon he abandoned her car in an attempt to conceal the murder. All the circumstantial evidence presented here, taken together, supported this theory beyond a reasonable doubt.

¶ 40     The State presented repeated evidence of the tumultuous relationship between Irma and defendant, lasting over a decade. Monica testified that during the October 17, 1997 incident, Irma and defendant were arguing in their bedroom when there was a loud noise; Irma immediately ran out of the room and the house, defendant followed her moments later, and 9-1-1 audio captured their voices detailing that Irma was bleeding and that defendant had a gun. Responding officer Hoffman testified that when he arrived at the scene, defendant was walking around outside with blood on his hands and carrying a bloody gun. Irma had been

shot in the hand. Although, as her sister testified, Irma did not follow through with defendant's prosecution for the incident, defendant lost his job as a Chicago police officer following it. And, even though years passed, the incident clearly remained significant to Irma, as detective Belcher found two 1997 newspaper articles about it in the purse she was carrying on the day of her murder.

¶ 41        Several witnesses corroborated that Irma and defendant were having marital problems at the time of her murder. Monica stated that in 2008, Irma took her children and left the family home in Oak Forest in order to separate from defendant; Irma eventually returned in early 2009, but she and defendant fought almost every other day and there was much tension in the house centered on defendant's fear that Irma would leave him. Gabriel noted the same, testifying that after the separation, defendant and Irma returned to their pattern of repeatedly arguing and they did not sleep in the same room or do anything together as a couple. Irma's sister stated that she often spoke to Irma after her fights with defendant and, the week before she was murdered, Irma told her she would soon be moving out of the Oak Forest home. Avolio, Irma's boyfriend since 2007, confirmed this; he and Irma, who never hid their relationship, had recently reunited, hired a relator, and found a house in which they planned to live. On May 26, 2009, five days before her murder, Irma gave Avolio $4,000 which he used for the house, as confirmed by the two bank withdrawal slips, one in the amount of $1,000 and the other in the amount of $3,000, found in her purse. And, Irma visited Quinones, her divorce attorney, on May 27, 2009, asking her to renew her previously filed divorce petition against defendant, which Quinones did.

¶ 42    Additional evidence, including financial information, cell phone records and forensic and witness testimony further supported the State's theory. First, bank records from the money market account Irma and defendant's mother shared showed that between January and the end of May 2009, the balance declined from almost $13,000 to slightly over $5,000. Video surveillance showed that at 5:52 p.m. on the day of Irma's murder, someone in a maroon Kia made a withdrawal from Irma and defendant's mother's shared account at the Berwyn ATM. By all accounts, defendant's mother owned a red Kia, she was mentally incapable of being left alone, and defendant used her car. In fact, Gabriel testified that he saw defendant and Carmen leave in the Kia that afternoon. Moreover, defendant's own financials were in poor condition, exhibiting a tax lien, delinquent accounts and a bankruptcy.

¶ 43    Next, cell phone evidence supported the State's proposed timeline of the murder and contradicted important information defendant gave to police that night. The State proposed that Irma was murdered sometime between 6:38 p.m. after she spoke to her eldest son on the phone and before 8:10 p.m. when Monica returned home. Irma's phone used a cell site at 5:12 p.m. and 6:30 p.m. that was less than a half mile from the Oak Forest home; she was clearly at or near the house at that time. Interestingly, defendant's cell phone records showed he made an outgoing call from Chicago, also at 5:12 p.m. The remainder of the calls in Irma's log were short-duration calls to her phone after 8:30 p.m. going to voicemail; this is consistent with Monica and Gabriel's testimony that they called her phone several times but only connected to Irma's voicemail. Meanwhile, officer Lorek, who responded to Monica and Gabriel's missing person's report, testified that defendant told him that he had been concerned about Irma and called her cell phone numerous times to locate her. Yet,

defendant's cell records show he made outgoing calls at only at 11:43 p.m. that night and 7:55 a.m. the next morning. Moreover, officer Lorek testified that defendant told him he had taken his mother shopping in Chicago that afternoon at 3:30 p.m. and did not return home until 7:30 p.m. Cell records confirmed that defendant's phone used cell towers near Chicago at 4:50 p.m. and near the north side of Chicago at 5:12 p.m., but that it then used a tower less than a mile west of the Oak Forest home at 6:49 p.m. And, later, at 8:29 p.m., defendant's phone used a cell tower for a direct-to-voicemail call showing its location as being east or northeast of the Oak Forest home, consistent with the direction where Irma's car was found but inconsistent with the home itself, which would have been west of that tower.

¶ 44    Finally, forensic and additional testimonial evidence supported the State's case. Monica and Gabriel testified that when they returned home, there was half-eaten food left out on the stove, but all the lights were off in the house and Carmen was home alone. They both described that these things were incredibly unusual: Irma always repackaged and refrigerated leftover food, and the family's rule was that Carmen was never to be left home alone due to her mental illness. They also described that, upon questioning defendant after he arrived home, he told them he had gone for a walk at the park. They found this incredibly unusual as well; both testified that in all the years they had lived with defendant, they never knew him to go for walks. Gabriel testified that on the afternoon of Irma's murder, he had asked her if she would drive him to his friend's house at 148th Street and Kilpatrick Avenue, a conversation which, as Gabriel described, defendant was home to overhear; according to Gabriel, defendant was also familiar with this location, as he had driven Gabriel to this same friend's house before. Irma's car, and body, were found just south of this location. Officer Lorek

23

testified defendant told him he found Irma's purse inside the house when he returned home at 7:30 p.m. that night. This, however, is in direct contradiction to Monica and Gabriel's testimony that they found Irma's purse, along with her sandals, in the garage after 8:15 p.m., whereupon they brought her purse inside. Gabriel also found his backpack, which he had been storing in Irma's trunk that day, suddenly moved to the basement behind some couches. Moreover, there were no signs of a break-in at the Oak Forest home, and there was no indication that Irma's car had been stolen. Additionally, after watching surveillance video of a maroon car making a withdrawal at the Berwyn ATM from Irma and Carmen's shared bank accounts at 5:52 p.m., detective Belcher drove the same path from there to the Oak Forest home, clocking in at 38 to 40 minutes; this is consistent and fits the timeline of defendant having seen the amount of money missing from the accounts and then calling Irma at 6:49 p.m. from less than a mile from the home as he drove there. Also, Scanlon testified that on the evening on the day of the murder, he saw a white Pontiac Grand Am or Trans Am, which he later identified as Irma's, momentarily park in front of his house, which was only two blocks away from where Irma's car was found. He saw a tall, thin Hispanic man exit the car, walk around to the trunk, stare at it and then reach over and wipe it; he then got back in the car and drove away. And, forensic evidence showed that there was blood on the bumper of Irma's car; there was a clump of human hair and blood in several places on the floor of the garage at the Oak Forest home; and the bullet fragments found in the garage matched the bullets recovered from Irma's body, indicating that they came from the same gun, shot in the garage.

24

¶ 45    Contrary to defendant's argument, proof of physical evidence connecting a defendant to a crime is not, nor has ever been, required to establish his guilt. See *People v. Williams*, 182 Ill. 2d 171, 192 (1998); accord *People v. Bobo*, 2020 IL App (1st) 182628, ¶ 43. Indeed, the bulk of the evidence presented at trial here was circumstantial. However, that evidence, along with the credibility of the witnesses and the weight to be given the evidence presented, was ultimately for the jury to consider. See *Williams*, 182 Ill. 2d at 192; *Steidl*, 142 Ill. 2d at 226. Obviously, as a court of appeals, our review of cases would be much easier were every one that came before us based on clear, direct evidence; the same sentiment, we are sure, is held by trial courts and juries everywhere. However, that is not reality; life, and the law, rarely operate in such manner. Regardless, such philosophical waxing does not, in any way, undermine the propriety and validity of circumstantial evidence, nor the value it has, in our jurisprudence. Just as direct evidence is required to meet certain legal thresholds to convict a defendant beyond a reasonable doubt, circumstantial evidence is an alternative, but nonetheless viable and acceptable, method to convict a defendant, as long as it meets the same threshold as direct evidence. In the instant case, that threshold was met, overwhelmingly. We find, contrary to defendant's contention, that there most certainly was sufficient evidence for the jury to rationally conclude as it did here, finding him guilty of first-degree murder. Accordingly, and pursuant to the legal standards we have outlined, we hold that a rational jury could clearly have found the essential elements of the crimes and defendant's role as the perpetrator beyond a reasonable doubt. Accordingly, there is no basis to reverse his convictions.

¶ 46    II. Admission of Evidence: October 1997 Incident and Irma's Funeral

25

¶ 47    Defendant next contends that the trial court erroneously admitted inflammatory and prejudicial evidence at trial which showed nothing more than his poor character, namely, the October 17, 1997 incident during which he shot Irma in the hand, and that he neither paid for nor attended Irma's funeral. He claims that this evidence should have been excluded because the shooting incident was both remote in time and factually dissimilar to the charged offenses, and the evidence surrounding the funeral was inflammatory and irrelevant. He insists the admission of this evidence necessitates the reversal of his conviction and remand for a new trial. We disagree.

¶ 48    The parties are in alignment with respect to the standard of review here. The admissibility of evidence at trial is a matter solely for the trial court. See *People v. Illgen*, 145 Ill. 2d 353, 364 (1991); *People v. Taylor*, 409 Ill. App. 3d 881, 914 (2011). In determining whether to admit evidence before a jury, a trial court must first ask whether it fairly tends to prove or disprove the offense charged and whether that evidence is relevant in that it tends to make the question of the defendant's guilt more or less probable. See *People v. Wheeler*, 226 Ill. 2d 92, 132 (2007); *People v. Dunmore*, 389 Ill. App. 3d 1095, 1105-06 (2009). The trial court may reject the evidence, even if otherwise relevant, on the grounds that it has little probative value regarding the offense in question due to its remoteness, uncertainty or unfairly prejudicial nature. See *People v. Harvey*, 211 Ill. 2d 368, 392 (2004); *People v. Figueroa*, 381 Ill. App. 3d 828, 840-41 (2008). Ultimately, however, the decision whether to admit the evidence lies within the trial court's discretion and will only be reversed where it is arbitrary, fanciful or unreasonable, or where no reasonable person would adopt the view of the court. See *Dunmore*, 389 Ill. App. 3d at 1105-06.

¶ 49          We examine the admission of evidence concerning the October 1997 incident here first.

¶ 50          The parties further agree that, while evidence of other crimes or prior bad acts is only admissible when relevant for purposes other than establishing a defendant's propensity to commit crime, there is a statutory exception when these other crimes or prior bad acts specifically involve instances of domestic violence. That is, section 115-7.4 of the Code of Criminal Procedure provides that specific instances of a defendant's prior acts of domestic violence are admissible and may be considered for their bearing on any relevant matter, including propensity, as long as their probative value is not outweighed by the risk of undue prejudice. See 725 ILCS 5/115-7.4 (West 2016); *People v. Dabbs*, 239 Ill. 2d 277, 290-91 (2010); accord *People v. Daniel*, 2022 IL App (1st) 182604, ¶¶ 129-131. In making this evaluation of probative value versus prejudice, section 115-7.4 specifies that the trial court may consider the proximity in time of the domestic violence evidence to the charged offense, their degrees of factual similarity, and other relevant facts and circumstances. See 725 ILCS 5/115-7.4(b) (West 2016); *Daniel*, 2022 IL App (1st) 182604, ¶ 130.

¶ 51          Defendant insists that in applying these factors to the October 1997 incident during which defendant shot Irma in the hand, "no judge could have reasonably found" that this evidence's probative value outweighed the undue prejudice it caused defendant before the jury. He claims that the 12-year gap between that incident and Irma's May 2009 murder severely diminishes the evidence's probative value; the two events lack any factual similarity, as the prior incident was an accident during which only one shot was fired while Irma and defendant were clearly married, while the murder was deliberate and occurred within the context of a pending divorce; and the prior incident was singular in nature and ambiguous,

27

rather than demonstrating a pattern. We find, however, that defendant's claims amount to nothing more than a mischaracterization of the evidence.

¶ 52 First, with respect to proximity in time, it is true that the October 1997 incident occurred 12 years before the May 2009 murder. However, and while defendant points to cases which have found similar lengths of time weigh against admissibility, there are cases where courts have properly found that such gaps do not. Compare *People v. Peterson*, 2011 IL App (3d) 100513, ¶53 (affirming exclusion of prior incidents that took place 11 to 22 years before charged offense) *vacated by People v. Peterson*, 958 N.E.2d 284 (2011), with *People v. Donoho*, 204 Ill. 2d 159, 184 (2003) (affirming admission of incident that occurred 12 to 15 years before crime charged and citing cases where incidents occurring over 20 years prior were deemed admissible). Ultimately, as our supreme court has declared, whether other crimes evidence should be admitted "should not, and indeed cannot, be controlled solely by the number of years that have elapsed between the prior offense and the crime charged." *Illgen*, 145 Ill. 2d at 370.

¶ 53 The key in the instant cause with respect to time is this: the contentious relationship between Irma and defendant clearly was constant and lasted throughout the years between the October 1997 incident and Irma's May 2009 murder. Unlike defendant's characterization, the evidence presented at trial refutes any intimation that the October 1997 incident, and the circumstances surrounding it, comprised a "one-time thing." Collaborative testimony showed that the October 1997 incident happened as Irma and defendant were fighting; that fighting continued through the years until Irma left with the children in order to separate from defendant in 2008; and that fighting resumed the moment she moved back in

with defendant in January 2009, five months before her murder. This was a pattern throughout these 12 years, hardly rendering remoteness a factor for the exclusion of the October 1997 incident.

¶ 54        Defendant's further insistence that the two events lack any factual similarity and there are no other relevant facts or circumstances to support the admission of the October 1997 incident also fails to hold water. Rather, in our view and upon examination, the incident and the crime charged share many factual similarities. Both of them involved firearms, took place in Irma and defendant's home, and resulted in Irma being shot. Additionally, both of them occurred during very contentious points in Irma and defendant's relationship: Monica specifically testified that the October 1997 incident was precipitated by the couple's loud arguing in their bedroom, and the crime charged occurred in the context of a pending divorce which Irma had legally revived only four days before her murder. Additionally, and again contrary to defendant's insistence, there were other relevant facts linking the incident and the crime charged, namely, the newspaper articles of the October 1997 incident found in Irma's purse. From the fact that Irma was carrying those 12-year-old clippings in the purse she was using on the day she was murdered, it can easily be gleaned that the October 1997 incident remained significant to her through the years. Moreover, the record demonstrates that the October 1997 incident was not the only other crimes or bad acts evidence sought to be presented at trial against defendant to show propensity.[7] The trial court, however, clearly weighed these to determine probative value versus prejudice, concluding that, at least with

[7] Pursuant to the record, the State sought the admission of evidence with respect to not only the October 1997 incident, but also events of domestic violence involving defendant that happened in 1992, 2002 and 2003. The trial court ruled that only the 1992 and October 1997 incidents were admissible for propensity. As the parties address only the October 1997 incident, we have limited our discussion accordingly.

respect to the October 1997 incident, the factors weighed in favor of its admission. Based on all this, we do not find that the trial court abused its discretion in admitting evidence regarding the October 1997 incident.

¶ 55        We likewise reach the same conclusion with respect to the trial court's admission of evidence demonstrating that defendant did not pay for or attend Irma's funeral. Briefly, as a threshold matter, the parties note that, while defendant raised objections at trial to both evidence that he did not pay for the funeral and evidence that he did not attend it, he specified in his posttrial motion only his objection to the evidence that he did not attend. Clearly, to properly preserve an issue for review, a defendant must both timely object at trial and include his assertion of error in his written posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (timely objection and written posttrial motion are required to preserve issue for appellate review). Though admitting his failure, defendant insists that his posttrial objection to the evidence that he failed to pay for the funeral "was the same" as an objection to evidence that he did not attend, since he had raised them together earlier, thereby rendering them "essentially one and the same." Defendant presents no legal support for his conclusion of looping these two separate points of evidence together and making a leap to say the proper presentation of one for review also preserves the other. In other words, evidence was presented to show defendant did not pay for Irma's funeral; separate evidence was then presented to show that he did not attend her funeral. Contrary to defendant's claim, these were not "one and the same." Without more, and in light of our timeless rules concerning the preservation of issues for appeal, we find no reason to absolve defendant from forfeiture of his argument with respect to his failure to pay for the funeral.

¶ 56    Defendant goes on to insist that, despite forfeiture, we should employ the first prong of plain error to review both claims together, as the evidence against him was closely balanced. See *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (under first prong, he must prove there was plain error and the evidence was so closely balanced that this error alone severely threatened to tip the scales of justice against him). However, we have already concluded the exact opposite, namely, that the evidence against defendant was not closely balanced but, rather, overwhelmingly proved his guilt beyond a reasonable doubt. Moreover, we specifically did so based on evidence separate and apart from the evidence presented that he did not pay for or attend Irma's funeral. Thus, even if it could be concluded that there was error in the admission of the evidence at issue, it would have been, in all respects, harmless beyond a reasonable doubt. See *People v. Mueller*, 2021 IL App (2d) 190868, ¶ 56 (the inquiry is whether the defendant's conviction would stand regardless of the error, and considerations may include whether other properly admitted evidence supported the conviction). Accordingly, and in light of this, we need not determine whether the trial court abused its discretion in admitting the evidence of defendant's failure to pay for and attend Irma's funeral where we already found there to be overwhelming evidence of his guilt apart from it. See *People v. McGee*, 398 Ill. App. 3d 789, 794 (2010), citing *People v. Herron*, 215 Ill. 2d at 187; see also *People v. Walker*, 232 Ill. 2d 113, 124 (2009) (absent error, there can be no plain error).

¶ 57    For all these reasons, we find no basis to reverse and remand for a new trial with respect to the cited evidence presented at trial.

¶ 58                III. Admission of Evidence: Defendant's Credit Report

¶ 59        Defendant's third contention on appeal focuses on the admission into evidence of his 2009 credit report, which showed that he had a tax lien against him, a bankruptcy and delinquent accounts. He asserts that, because this report was prepared by TransUnion based on information it obtained from third-parties, it amounted to hearsay within hearsay. He further asserts that, although the State provided an exception to the first layer by demonstrating, through TransUnion senior consultant Orlowski's testimony, that TransUnion prepared the report under the business-record exception, the State did not provide an exception to the statements underlying the TransUnion report and the trial court improperly failed to require such a foundation. Defendant therefore claims that the trial court's admission of this evidence was erroneous, the error was not harmless, and reversal and remand are required. Again, we disagree.

¶ 60        As a threshold matter, we note that defendant, citing to *People v. Sundling*, 2012 IL App (2d) 070455-B, ¶ 82, and *People v. Risper*, 2015 IL App (1st) 130993, ¶33, but without further explanation, declares that "[w]hether a statement constitutes hearsay is a legal question" and, thus, a *de novo* standard of review is applicable. He is mistaken. This Court, in *People v. Perkins*, 2018 IL App (1st) 133981, recently tackled the question concerning the admission of hearsay evidence and the proper standard of review. Therein, we explained that while *de novo* review of the trial court's admission of hearsay evidence is proper when there is a dispute over the legal content of a hearsay exception (*i.e.*, what the exception says or encompasses in legal terms), abuse of discretion review of the trial court's admission of hearsay evidence is proper where the dispute is not a misinterpretation of the hearsay exception itself but, rather, a question of whether the statement at issue falls within the

hearsay exception (*i.e.*, does the specific statement involved in the facts at issue fit into the exception). See *Perkins*, 2018 IL App (1st) 133981, ¶¶ 52-53. Clearly, in the latter instance, the admission of hearsay evidence lies solely within the discretion of the trial court. See *Perkins*, 2018 IL App (1st) 133981, ¶ 53. In the instant cause, defendant's argument is not that the trial court misinterpreted the exception of hearsay within hearsay in legal terms. Instead, he insists that pursuant to the specific facts of this case, the trial court improperly found that the credit report was admissible under a hearsay exception. His argument, then, is, at its core, one involving the admission of evidence. See *Illgen*, 145 Ill. 2d at 364; see also *Perkins*, 2018 IL App (1st) 133981, ¶ 53, citing *People v. Spicer*, 379 Ill. App. 3d 441, 449 (2008) ("[t]he trial court has discretion to determine whether statements are hearsay and, if so, whether they are admissible under an exception"); accord *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 49 ("Illinois courts apply an abuse-of-discretion standard when reviewing a trial court's decision regarding the admission of hearsay"). Accordingly, we employ an abuse of discretion standard of review of this issue, and we will reverse the trial court's hearsay ruling here only if we determine that it was arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. See *Perkins*, 2018 IL App (1st) 133981, ¶ 53; accord *Littleton*, 2014 IL App (1st) 121950, ¶ 49.[8]

¶ 61        As noted earlier, Orlowski testified regarding a multi-page report TransUnion prepared in 2009 concerning defendant's credit. He identified several of defendant's accounts, which showed he had a tax lien, he had filed for Chapter 7 bankruptcy, and he had accounts in

---

[8] Also, we note that we may affirm the trial court when correct based on any reason appearing in the record before us. See *Perkins*, 2018 IL App (1st) 133981, ¶ 53.

collections status. Orlowski also identified accounts belonging to defendant showing some to be in good standing, others not in good standing, and others that had been closed, paid or reported stolen. Orlowski admitted that TransUnion does not create credit records but, rather, collects credit information from other companies and reports it; he could not ensure that those companies' information was correct; and TransUnion had been sued in the past for reporting inaccurate credit information.

¶ 62    As the parties correctly note, the TransUnion report incorporates hearsay within hearsay. Briefly, hearsay is an out-of-court statement offered for the truth of the matter asserted. See *Littleton*, 2014 IL App (1st) 121950, ¶ 52, citing *People v. Caffey*, 205 Ill. 2d 52, 88 (2001). Though hearsay is generally inadmissible, it may be admissible if it fits within an exception to the rule against hearsay. See *Littleton*, 2014 IL App (1st) 121950, ¶ 64; citing *Caffey*, 205 Ill. 2d at 88-89. Where, as here, a hearsay statement (the TransUnion report) contains further hearsay within it (statements from the third-party reporting agencies), such hearsay within hearsay is admissible as long as each part, or layer, of the combined statements meets an exception to the hearsay rule. See *People v. Thomas*, 178 Ill. 2d 215, 237-38 (1997).

¶ 63    In his brief on appeal, defendant does not contest that the State laid an adequate foundation for the TransUnion report itself, *i.e.*, the first layer of hearsay; he admits that the State overcame any barrier to its admission by showing, through Orlowski's testimony that it falls under the business records exception to the hearsay rule, as TransUnion makes these reports in the regular course of its business. Rather, his argument rests in his contention that the information contained in the report which came from third-parties, *i.e.*, the second layer of hearsay, was not admissible as the State did not offer an exception to the rule against

hearsay for that portion and, more critically, that the trial court erroneously did not require it to lay a foundation for its admissibility.

¶ 64      However, as the State aptly points out, our Court has made clear that, "[w]here a third party is authorized by a business to generate the record at issue, the record is of no use to the business unless it is accurate and, therefore, the record bears sufficient indicia of reliability to qualify as a business record under the hearsay rule." *Argueta v. Baltimore & Ohio Chicago Terminal R.R. Co.*, 224 Ill. App. 3d 11, 20-21 (1991). This makes perfect sense. A business, whose business it is to obtain information from third parties to create its own records, would have no use for that information if it were not accurate. In fact, as our Rules of Evidence state, hearsay is admissible under the exception of business records where the record was created at or near the time of activity by a person with knowledge, kept in the course of a regularly conducted business activity, and if it is the regular practice of that business activity to make the record. See Ill. R. Evid. 803(6) (eff. Sept. 28, 2018). Therefore, where a business receives information from a third party, that information can be admitted as part of the business's own records under Rule 803(6) on a showing that the business received the information in its normal course of business, integrated that information, and used it in its daily activities. See *Solis v. BASF Corp.*, 2012 IL App (1st) 110875, ¶ 86 (holding that while a person receiving information from a business cannot solely by virtue of receiving it lay a sufficient foundation for its admission, "there is an exception" where a business receiving it, acting in the regular course of business, integrates the information received and relies on it for its daily business operations).

¶ 65        The credit report here fits squarely into this exception for third-party information received by a business that then integrates it into its daily operations as part of its business. That is, TransUnion's business is to obtain credit information from third-party sources as its regular practice. Undeniably, this is the very essence of what TransUnion does. It then integrates this information and uses it in its daily operation, namely, to compile people's credit reports and report them, as a credit reporting agency. It is clearly reasonable, then, to find that the third parties from which TransUnion obtains financial information provide that information to TransUnion pursuant to a business relationship, and that TransUnion, in turn, integrates that information and uses it in the course of its own business. Accordingly, as this second layer of hearsay also fits within an exception to the hearsay rule, we find that the trial court did not abuse its discretion in admitting the TransUnion credit report and its contents. Compare *Solis*, 2012 IL App (1st) 110875, ¶ 86, and *Argueta*, 224 Ill. App. 3d at 20-21, with *People v. McCullough*, 2015 IL App (2d) 121364, ¶¶ 121-22 (hearsay within hearsay properly excluded where third-party caller who provided hearsay information was an "outsider" wholly unrelated to telephone company and, thus, was not acting within the business of that company). And, in contrast to any intimation otherwise, this is true where, as here, the trial court may not have issued an explicit ruling as to the hearsay exception but the record before us otherwise supports its decision that it falls within one and its admission is proper. See *Perkins*, 2018 IL App (1st) 133981, ¶ 53 ("We may affirm the trial court when correct for any reason appearing in the record").

¶ 66        Even were we to find that the trial court did err in admitting the credit report, which we do not, we still would not reverse and remand defendant's conviction as he urges because any

such error would be harmless. See *Littleton*, 2014 IL App (1st) 121950, ¶ 65 (reviewing court is to determine whether error in admission of hearsay evidence is nonetheless harmless; if so, reversal is not warranted). Defendant claims that, "given the weak circumstantial evidence of guilt in this case," the State's argument that defendant's motive for murder was his financial distress was highly probative and "the linchpin of that argument" was defendant's credit report. Defendant then goes a step further to state that "[w]ithout the credit report, the State would have been left without a plausible motive for the charged offense, making it reasonably possible that the jury would not have found [him] guilty."

¶ 67        " 'The admission of hearsay evidence is harmless error where there is no reasonable probability that the [trier of fact] would have acquitted the defendant absent the hearsay testimony.' " *Littleton*, 2014 IL App (1st) 121950, ¶ 65, quoting *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990); accord *People v. Meyers*, 2018 IL App (1st) 140891, ¶47. We have already discussed at length that, contrary to defendant's insistence, the evidence against him, minus the TransUnion credit report, though circumstantial, was not weak. Instead, it was overwhelmingly sufficient to sustain his conviction beyond a reasonable doubt. Moreover, there was much other evidence of defendant's financial situation and/or financial motive presented at trial, apart from the particular TransUnion report at issue. First, the jury heard evidence from multiple witnesses that defendant had lost his job as a Chicago police officer following the incident where he shot Irma in the hand. Second, there was much evidence showing that Irma was planning on leaving defendant in the days before she was murdered— her boyfriend, sister and attorney all corroborated each other in this regard. Finally, evidence was presented demonstrating that Irma had withdrawn considerable amounts of money out of

an account she shared with defendant's mother; the money market account had been depleted from almost $13,000 in January 2009 to only about $5,000 by May 2009, and Irma withdrew $4,000 just five days before May 31—the same day surveillance footage showed someone in a small maroon car (just like the one belonging to defendant's mother which defendant used regularly due to her mental incapacities and which he used that very afternoon, as witnessed by Gabriel) use Carmen's ATM card to make a withdrawal, and the same day Irma was murdered, less than about two hours after that withdrawal. Therefore, even if the admission of the TransUnion report amounted to error (which, again, it did not), that error was harmless, as there is no reasonable probability that the jury here, based on all the other evidence presented, would have acquitted defendant absent that report's admission.

¶ 68     Ultimately, we find no error on the part of the trial court in allowing the admission of the TransUnion credit report.

¶ 69                                IV. State's Closing Argument

¶ 70     Defendant next contends that he was denied a fair trial due to improper comments made by the State during its closing argument. He cites four individual instances of error and additionally argues that when taken together, they amounted to a pattern of misconduct constituting plain error.

¶ 71     Defendant admits in his brief on appeal that he lodged only one objection at trial in response to the citations of error he now raises, and that he did not preserve even that objection in his motion for a new trial. He acknowledges, therefore, that he has forfeited this issue. See *Piatkowski*, 225 Ill. 2d at 564 (issues not raised at trial or in a posttrial motion are not preserved for review and are forfeited). However, in addition to insisting that *de novo*

review is required, he asks us to reach the issue under both prongs of plain error review since the evidence in his cause was closely balanced and since the four cited errors were so serious that they affected the fairness of his trial. See *Herron*, 215 Ill. 2d at 178-79. Again, we have already discussed, and repeatedly so, the evidence against defendant was not closely balanced; accordingly, his request for plain error review under that prong fails. As for his request for review under the second prong, we likewise fail to find, as we describe below, any merit for reversal and remand of his conviction. We would further note that our ultimate conclusion would be the same under either the incorrect *de novo* standard of review defendant insists is required, or an abuse of discretion standard, which is the proper and applicable standard here. See *People v. Cornejo*, 2020 IL App (1st) 180199, ¶¶ 126-28 (affirmatively holding that we review closing argument prosecutorial misconduct claims for abuse of discretion, and not *de novo*).

¶ 72    The State is allowed a great deal of latitude in closing argument. See *People v. Nieves*, 193 Ill. 2d 513, 532 (2000); accord *People v. Wiley*, 165 Ill. 2d 259, 294 (1995). It " 'may comment on the evidence and any fair, reasonable inferences it yields.' " *People v. Phillips*, 392 Ill. App. 3d 243, 275 (2009), quoting *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). The test for determining whether there was reversible error because a remark resulted in substantial prejudice to a defendant is whether the remark was a material factor in his conviction, or whether the jury would have reached a different verdict had the State not made the remark. See *People v. Flax*, 255 Ill. App. 3d 103, 109 (1993); accord *Nieves*, 193 Ill. 2d at 533. We review the allegedly improper remark in light of all the evidence presented against the defendant (see *Flax*, 255 Ill. App. 3d at 109), as well as within the full context of

the entire closing argument itself (see *People v. Cisewski*, 118 Ill. 2d 163, 176 (1987)). Ultimately, unless deliberate misconduct by the State during closing argument can be demonstrated, comments will be considered incidental and uncalculated and will not form the basis for reversal. See *People v. Cloutier*, 156 Ill. 2d 483, 507 (1993).

¶ 73    Based on the record before us, and when viewed within their context and within the entirety of this trial, we do not find that the State's comments, as cited by defendant, were erroneous or that they merit reversal and remand of his convictions.

¶ 74    The first comment defendant cites occurred when the State remarked, in its closing argument:

> "So did the defendant perform the acts which caused the death of Irma Rodriguez? Well, let's look to the opposite. Let's look at any evidence that points to anyone other than the defendant who would have performed these acts. There is none. There is no evidence that points that [*sic*] anybody else."

Defendant insists that, with this remark, the State improperly shifted the burden to him to provide evidence demonstrating his innocence. His insistence is a mischaracterization.

¶ 75    The State's remark was nothing more than a reasonable inference from the evidence presented, which it had every right to make. The State's theory was that defendant killed Irma; defendant's theory was that it was someone else. The State presented much circumstantial evidence in support of its theory, including bank records, cell phone records and testimony from family and friends about Irma and defendant's relationship. It also, quite significantly, presented evidence that this was not a random act of violence: specific testimony indicated that there was no evidence that the family home was broken into that

evening, and there was no evidence that Irma's car had been stolen. Moreover, in support of his theory, defendant told jurors during his opening argument that the State wanted them to believe "the husband did it" and to "jump to that conclusion," just as the police did, without considering "any other people." With the cited remark in closing, the State was responding to the argument invited by defendant himself; it was discussing that there was no evidence pointing to anyone else, especially when based on the evidence already presented at trial. This was just another way for the State to refute defendant's theory. See *People v. Legore*, 2013 IL App (2d) 111038, ¶ 56 (defendant cannot complain of the State's comments on argument he invited at trial). Furthermore, we find that the State in no way commented or implied that defendant was required to present evidence. It simply remarked that no evidence existed to support his theory, and this was proper for the State to do. See *People v. Glasper*, 234 Ill. 2d 173, 212 (2009) (no error where State's comments about lack of evidence suggested the defendant needed to present some to prove his innocence, and were also invited by his argument and were reasonable in light of the evidence presented). Finally, the record shows that the trial court explicitly instructed the jury, twice (once at the outset of trial and again after closing argument), that the burden of proving defendant's guilt rested solely with the State, and that the State had to do so beyond a reasonable doubt in order for them to convict him. From all this, we find no error with this remark from the State.

¶ 76    The next comment defendant cites originates from the State's remarks about where Irma's keys were found. In further discussing that Irma's murder was not a random act of violence, the State commented that the jury "would have to believe that this was a stranger danger random act of violence, and that her keys magically get back to the house." The only

41

evidence presented about Irma's keys, however, as defendant points out, was that they were brought by police to Sergeant Daley, who assisted in recovering Irma's car; the keys were found by police at another location, but that location was not disclosed at trial. Defendant insists that, in conjunction with his earlier argument about burden shifting, the State's remark proved highly incriminating, as it intimated that only one of four people could have murdered her and brought the keys home—her loving children, her disabled mother-in-law, or defendant with whom she was having problems. However, Irma's keys and their location did not factor into the evidence against defendant in the slightest. They were mentioned incredibly briefly at trial, and only in connection with how the police were able to open the trunk of the car to find Irma's body. That the State mentioned them during closing—again, very briefly, in passing, and without any discussion—renders the cited comment, in our view, to be inconsequential. Moreover, the record shows that defendant objected to the State's remark in open court that there had "been no testimony where the keys were," the trial court immediately sustained defendant's objection, and the State did not mention the keys again. From all this, it cannot be said that this comment was, at all, a material factor in defendant's conviction so as to have caused him prejudice. See *People v. Smith*, 2014 IL App (1st) 103436, ¶ 70, citing *People v. Runge*, 234 Ill. 2d 68, 142 (2009) (where other factors show comment did not amount to prejudice, reversal is not warranted).

¶ 77     Defendant's third citation of error is his assertion that the State "overstated what the historical cell-site analysis established." He claims that, whereas agent Raschke specified that this evidence could only provide a general location for a phone and not a specific one, the State nonetheless remarked in its closing argument that this evidence "put[] her [Irma] in

her residence" at 6:30 p.m., "put him [defendant] right at the same location as Irma" at 6:49 p.m., and then proved he was "where Irma's car [was] found" at 8:29 p.m.—all comprising improper misstatements of the evidence and causing prejudice. Defendant's assertion, however, is a classic example of improperly isolating remarks from a lengthy closing argument in order to claim error. As the record wholly demonstrates, in the several paragraphs of the transcript of the State's closing argument preceding the remarks at issue, the State devoted much time to reviewing agent Raschke's testimony and its content. It stated, explicitly, and directly in line with his explanations, that the cell phone analysis evidence can tell only "the general area a person is" at "the time they are making or receiving phone calls." Then, when detailing the evidence of Irma and defendant's cell phones in particular, the State further clarified, and again in line with agent Raschke's testimony, that Irma's phone showed "she was kind of in the area" of the family home at 6:30 p.m., because the cell tower closest to the residence had the strongest signal and it was about half a mile away. At this point, the State remarked that this evidence "puts her in her residence at 6:30" p.m., immediately explaining this was a "reasonable inference" from all the evidence presented, including Gabriel and Monica's observations of food on the stove. Defendant objected, and the trial court, without sustaining or overruling the objection, instructed the jury that reasonable inferences may be made but they should not consider closing arguments as evidence. Contrary to defendant's characterization, these remarks, when taken in context of the whole closing argument, were not erroneous. The State clarified for the jury the limitations of the cell phone analysis evidence, just as agent Raschke did. The cited comments, moreover, were simply reasonable inferences from *all* the evidence presented, not

43

just the cell phone analysis evidence itself. Additionally, not only did the trial court provide proper instructions to the jury in this regard as a curative measure, but we would be hard-pressed to find prejudice, particularly where defendant's theory of the case, namely, that he was not the killer, had nothing to do with exact locations anyway (*i.e.*, whether Irma and/or defendant were inside the home as opposed to merely near it). See *People v. Rush*, 294 Ill. App. 3d 334, 340-41 (1998) (State has right to comment on evidence in closing argument and make any reasonable inference therefrom, even if it is unfavorable to defendant; and, a trial court's instructions to jury that closing argument is not evidence cures any error resulting from State's remarks).

¶ 78    Defendant's final citation of error on the part of the State during closing argument is that it urged the jury to convict out of sympathy for Irma's children and not based on proof of his guilt. He refers to the State's remarks that it is "terrifying" to know Monica and Gabriel were calling Irma when she was already dead, that they were "innocent people" and the "victims here" whose mother was taken away, and that had they known it was the last time they would see her, they "would have stuck around." Defendant insists such comments did nothing but inflame the passions of the jury to convict him, providing extra prejudice as they were made by the State during rebuttal closing argument, to which he could not respond. Defendant is correct that courts highly disfavor sympathetic and emotional appeals to juries describing the family of a murder victim left behind. See *People v. Mapp*, 283 Ill. App. 3d 979, 990-91 (1996). However, even where such remarks are made, they must be reviewed within the context of the entirety of closing argument, that is, closing argument proper and rebuttal, and, where it can be said that such improper remarks most likely did not play a role

44

in the jury's verdict, particularly based on overwhelming evidence of the defendant's guilt, we will not conclude that reversal is warranted. See *Mapp*, 283 Ill. App. 3d at 991; see also *People v. Barker*, 298 Ill. App. 3d 751, 757-58 (1998) (comments regarding family members left behind, though improper and should be admonished, did not merit reversal where evidence of guilt was overwhelming); see also *People v. Hope*, 116 Ill. 2d 265, 275-76 (1986) (murder victims do not live in vacuums and mentions of victim's family do not automatically amount to reversible error; how such comments are introduced must be examined); contrast *People v. King*, 2020 IL 123926, ¶ 21 (admission of *testimony* about victim's family's reaction to victim's death was clearly erroneous). In the instant cause, we find that defendant again pulls the State's comments out of context of what was a lengthy closing and rebuttal argument. First, he neglects to mention that, in his own closing argument, he referenced repeatedly that he cooperated in the search for Irma by, for example, consenting to officer Lorek's entry of his home that night and placing numerous calls to Irma to assist in finding her—actions that clearly demonstrated both his concern for her and his innocence. The State's cited comments came in response to these assertions. The State restated defendant's closing proposition and then proceeded to compare his actions to those of Irma's children, *i.e.*, they called Irma repeatedly, went looking for her and reported her missing to police, whereas defendant showered, stayed in the house, and his cell phone records showed only one call that evening after Irma's disappearance. The State then related all this back to the evidence presented in an effort to dispel defendant's insistence that his actions demonstrated the concern of an innocent person. Clearly, when the comments were made, the State was responding directly to defendant's own assertions, made first.

Additionally, and again, the evidence against defendant was overwhelming here. No fair-minded juror could have reasonably voted to acquit defendant based solely on these cited comments by the State. See *Barker*, 298 Ill. App. 3d at 757-58, citing *Mapp*, 283 Ill. App. 3d at 991 (despite even serious prosecutorial misconduct in referencing family during closing argument, overwhelming evidence of guilt supported affirmance).

¶ 79        Finally, defendant attempts to advocate for reversal by claiming that while each cited comment may not, in and of itself, warranted such a remedy, the cumulative effect of them demonstrates sufficient prejudice so as to have denied him his right to a fair trial. We do not agree. Under whatever measure of review—direct, plain error, closely balanced evidence or fundamental fairness—we have thoroughly examined the record, considered each of these cited instances at length, and have found none of them amount to reversible error. Accordingly, as each instance is not error, their cumulative effect similarly cannot rise to the level of reversible error either. See *People v. Irwin*, 2017 IL App (1st) 150054, ¶ 57.

¶ 80                        V. Historical Cell Site Analysis and *Frye*

¶ 81        Defendant's fifth contention on appeal is that the trial court erred in admitting agent Raschke's testimony regarding the historical cell site analysis data without first holding a hearing pursuant to *Frye v. United States*, 293 F. 1013 (1923). He claims that because agent Raschke's testimony was based on "the scientific underpinnings of cellular telephone networks," the State had the burden to show historical cell site analysis is generally accepted by the relevant scientific community and, by denying his request to hold a *Frye* hearing, the court admitted Raschke's testimony in error, which was not harmless because it "played a critical role" in his conviction. Again, we disagree.

¶ 82        Indeed, the admission of expert testimony is governed by *Frye*. See *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30 (2004); accord *People v. Fountain*, 2016 IL App (1st) 131474, ¶ 57. The *Frye* standard dictates that scientific evidence is admissible at trial when the methodology or scientific principle upon which the opinion is based is sufficiently established to have gained general acceptance in a particular field. See *Fountain*, 2016 IL App (1st) 131474, ¶ 57; *People v. Wilson*, 2017 IL App (1st) 143183, ¶ 45. This does not mean universal acceptance, nor does it require that the methodology be accepted by even a majority of experts; instead, it is sufficient that the underlying method is reasonably relied upon by experts in the relevant field. See *Fountain*, 2016 IL App (1st) 131474, ¶ 57, citing *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 78 (2002), abrogated on other grounds by *Simons*, 213 Ill. 2d at 530. Significantly, the *Frye* test applies only to "new" or "novel" scientific methodologies, which are those methodologies that are "original or striking" or do not resemble something already known or used. *Fountain*, 2016 IL App (1st) 131474, ¶ 57 (internal citations omitted); see also *People v. Williams*, 2017 IL App (1st) 142733, ¶ 38, citing *People v. McKown*, 236 Ill. 2d 278, 282-83 (2010). Once a methodology has gained general acceptance in the particular scientific community, its general acceptance is presumed and it is considered established as a matter of law. See *Williams*, 2017 IL App (1st) 142733, ¶ 38 (it is presumed accepted in subsequent litigation). A court may determine such general acceptance either based on the results of a *Frye* hearing or by taking judicial notice of unequivocal and undisputed prior judicial decision or technical writing on the subject. See *Williams*, 2017 IL App (1st) 142733, ¶ 38, citing *People v. McKown*, 226 Ill. 2d 245, 254 (2007). Also significantly, a reviewing court is free to

consider court opinions from other jurisdictions in determining whether a *Frye* hearing was warranted. See *Fountain*, 2016 IL App (1st) 131474, ¶ 57, citing *Simons*, 213 Ill. 2d at 531.

¶ 83    As the record reveals, defendant filed three pretrial motions seeking to preclude the introduction of the historical cell site analysis, with the third one (which is at issue here) requesting a *Frye* hearing on its admissibility. The trial court denied the motion. Citing the applicability of the *Frye* standard, the court noted that historical cell site analysis is "an accepted scientific theory in the community; and, therefore, there need not be any *Frye* hearing to determine whether or not, because it's not novel, to determine whether or not it's admissible." The court also commented that it had presided over a triple murder case "where the same issue was brought up, and it [the same motion] was denied." For various reasons, and based on the record before us, we find no error on the part of the trial court in denying defendant's request for a *Frye* hearing.

¶ 84    First, and foremost, our courts have repeatedly held that testimony regarding historical cell site information is not a new or novel scientific principle or methodology. See *Fountain*, 2016 Il App (1st) 131474, ¶¶ 58-59 (citing collection of cases and declaring use of cell phone location records to determine general location of a cell phone does not constitute "new" or "novel" scientific information; rather, it has already been "widely accepted as reliable by numerous courts throughout the nation"); see also *Williams*, 2017 IL App (1st) 142733, ¶ 39 (same); accord *United States v. Hill*, 818 F. 3d 289, 297 (7th Cir. 2016) (federal district courts have uniformly rejected challenges to admissibility of historical cell site analysis, as the science and methods on which this is based "are understood and well documented"). Defendant admits as much in his own brief on appeal. But, upon his open recognition of

such caselaw, he goes on to assert that we should not follow these holdings because the use of historical cell site analysis is still new. We find his assertion inexplicable here. *Fountain*, which we have cited herein, was decided some six years ago, and its progeny, which consists of much published and unpublished caselaw, has been consistent in holding that historical cell site analysis is, in direct contradiction to his insistence, not new or novel. See, *e.g.*, *Fountain*, 2016 Il App (1st) 131474; *Williams*, 2017 IL App (1st) 142733. Defendant has provided no caselaw to the contrary. As such, a *Frye* hearing was not required here. See *Fountain*, 2016 Il App (1st) 131474, ¶ 59 (scientific concepts that are not new or novel do not require *Frye* hearing).

¶ 85    Moreover, we point out that agent Raschke, in particular, is not new to this Court. *Fountain*, *Williams*, *Wilson*, and *Hill*—just to name a few—were all cases that saw agent Raschke testify regarding historical cell site analysis in criminal trials. Time and again, in those cases and others, our Court found that it was not an abuse of discretion to admit his testimony in this regard. See *Fountain*, 2016 Il App (1st) 131474, ¶ 61 (trial court did not err in not conducting a *Frye* hearing with respect to agent Raschke's historical cell site analysis where he used historical data from the defendant's cell phone records to demonstrate the towers that the defendant's phone had actually activated, as this not new or novel scientific principle or methodology); *Williams*, 2017 IL App (1st) 142733, ¶ 39 (where agent Raschke testified that cell phones use radio signals to connect to cell towers, which is generally but not always the closest tower to the cell phone, and once the signal connects, the phone company records some basic information such as the phone numbers involved, length of the call and identification of the towers, this was not evidence requiring *Frye* hearing); *Wilson*,

2017 IL App (1st) 143183, ¶ 47 (where *Frye* standard did not apply to agent Raschke's historical cell site analysis, defense request for trial court to hold *Frye* hearing would have been futile and ineffective assistance of counsel claim failed); *Hill*, 818 F. 3d at 298 ("Historical cell-site analysis can show with sufficient reliability that a phone was in a general area *** and the science is well understood. [Citation omitted.] This technique requires specialized training, which Agent Raschke has and has employed successfully on hundreds of occasions").  This was particularly true where the record in those cases showed that agent Raschke emphasized during his expert testimony that a defendant's cell phone's use of a cell site did not mean that the defendant was right at that tower or at any particular spot near that tower.  See, *e.g.*, *Hill*, 818 F. 3d at 298-99 (admission into evidence of agent Raschke's testimony of historical cell site analysis was not abuse of discretion, particularly where his testimony on both direct and cross examination made clear the evidence's pitfalls and imprecision).  As we have discussed herein, agent Raschke's testimony in the instant case was exactly that: he was careful to emphasize, repeatedly, that historical cell site analysis in general terms is limited and he explained, again repeatedly, that the data he reviewed from Irma and defendant's phones provided only the general area in which their phones were located based on tower usage, and that it in no way indicated Irma or defendant's precise locations at precise times.  Since it is clear that the methodology of historical cell site analysis—and from agent Raschke himself, no less—is accepted in our courts, its consideration as an established matter of law rendered a *Frye* hearing, for this reason as well, unnecessary in the instant cause.  See *Williams*, 2017 IL App (1st) 142733, ¶ 38.

¶ 86    Defendant insists that a *Frye* hearing was nonetheless required here because agent Raschke's testimony was based on, as he classifies it, "the science underlying ratio-spectrum telecommunications." He claims that while reading coordinates of cell sites from phone records and plotting them on a map may not be considered by our courts as scientific procedure (see *Fountain*, 2016 IL App (1st) 131474, ¶ 58, and *Wilson*, 2017 IL App (1st) 143183, ¶46), agent Raschke did more here. That is, in an attempt to link inferences together, defendant claims that, because agent Raschke testified to locations of cell towers used by a given phone, this information is only relevant when one infers that the cell phone is connecting to the closest possible cell tower, and that requires one to infer the geographic location of the phone, and that inference is based on "underlying radio-spectrum communications" of cellular telephone networks. While we agree that agent Raschke perhaps did more than plot dots on a map for the jury (as he did, for example, in *Wilson*), we disagree with defendant's notion that his testimony somehow veered off into a new realm of scientific methodology simply because he briefly talked about cell phone towers. This is plainly not true.

¶ 87    Rather, upon our review of his testimony as contained in the record before us, we find that agent Raschke testified in much the same manner as he has in cases past, including *Fountain*, *Williams*, and *Hill*. Yes, he spoke about how cell towers operate—but this was brief and nothing new, novel, or confusing to the average, everyday cell phone user, which today, is virtually everyone in our society. The first part of his testimony was very generalized, and he gave an elementary, even rudimentary, description of how cellular networks function. He explained that when a cell phone makes or receives a call, the phone

"communicates with a cell tower" that has "radio frequency transmitters and receivers," which are just pieces of equipment that connect to the actual cellular network, enabling the phone to work. He also noted that when a cell phone is on, it is scanning for a radio frequency, measuring signals from cell towers to "always use the strongest, clearest signal" as cell phones are programmed to do to ensure the best call quality, and that the strongest, clearest signal "generally comes from the tower that the phone is closest to." Such information has become part and parcel of daily life: cell phones ping from the cell tower closest to them, unless, of course, the tower is obstructed or not functioning properly when the phone is in use. Nowadays, and especially in light of the common quest for the best cell phone signal, this can hardly be considered a scientific principle. Moreover, there is no mention in the record, by agent Raschke during his testimony or by anyone else, for that matter, of the phrase "radio-spectrum communications." This is a construct of defendant's own making. Such a term was never used at all. "Radio frequency" was used, but again, this can hardly be considered a novel concept in today's society, which has now made even radios seem antiquated.

¶ 88    Defendant also makes much of the trial court's comment, made when it denied his motion, that it had presided over a triple murder case "where the same issue was brought up, and it [the *Frye* motion] was denied." He insists this was improper because, according to the *Frye* standard, if the trial court does not hold a *Frye* hearing, it must take judicial notice of "unequivocal and undisputed prior judicial decision or technical writing on the subject" in order to determine the evidence's validity and admissibility (*Williams*, 2017 IL App (1st) 142733, ¶ 38), and, as the triple murder case to which this trial court referred was not an

"unequivocal and undisputed prior judicial decision," it did not count as a viable basis to deny his motion. While this may be true, we again note that, not only is historical cell site analysis now presumed accepted in subsequent litigation (see *Williams*, 2017 IL App (1st) 142733, ¶ 38), we, as a reviewing court, are free to consider court opinions from other jurisdictions in determining whether a *Frye* hearing was warranted (see *Fountain*, 2016 IL App (1st) 131474, ¶ 57), which we have concluded was not in the instant case. And, we would further note that the trial court made the brief comment of the triple murder case in passing; it was not the foundation for the denial of defendant's *Frye* motion. To the contrary, that was, as the trial court declared, because it found historical cell site analysis to be "an accepted scientific theory in the community; and, therefore, there need not be any *Frye* hearing to determine whether or not, because it's not novel, to determine whether or not it's admissible."

¶ 89    Finally, even if the trial court erred in not holding a *Frye* hearing, which it did not, any error in this regard would be harmless. Defendant insists that the historical cell site analysis "played a critical role" in his conviction. This is pure speculation. As we have noted repeatedly, the evidence against defendant was overwhelming. This evidence consisted of much more than just the historical cell site analysis to which agent Raschke testified. We have detailed that abundantly in our decision herein. To say that the jury relied solely, or even mostly, on this testimony when so much other evidence was presented is something we will not do. Furthermore, the record clearly demonstrates that defendant had an opportunity to cross-examine agent Raschke to the fullest regarding the evidence at issue and its shortcomings. Agent Raschke even admitted that he did not check the 2009 maintenance

records for the cell towers he used as the basis for his analysis, and he did not conduct any network field testing in 2009 or anytime thereafter. This, combined with the repeated limitations presented to the jury, on both agent Raschke's direct and cross examinations, that historical cell site analysis cannot pinpoint an exact location or specific address of an individual but can only show that a cell phone "was in a general area covered by" a certain tower at a particular time in relation to other certain cell towers, renders any perceived error in the trial court's failure to hold a *Frye* hearing harmless.

¶ 90                                    VI. Cumulative Error

¶ 91        Finally, defendant asserts on appeal that if we do not find that any of his contentions individually merit reversal of his conviction, we should nonetheless reverse and remand for a new trial. He claims that all the alleged errors he cited, combined with "the closely balanced evidence," demonstrate that their cumulative effect resulted in the denial of a fair trial.

¶ 92        There is generally no cumulative error where a defendant's alleged errors do not amount to reversible error on any individual issue. See *People v. Green*, 2017 IL App (1st) 152513, ¶ 118. Based on our thorough review of the record, and our equally thorough examination of the alleged errors raised by defendant, we have found that there was no error in any of the claims pursued by him on appeal. Since we have found no individual error, there can be no cumulative error. See *Green*, 2017 IL App (1st) 152513, ¶ 118 (no cumulative error can be found on appeal were no error occurred at all during trial); see also *Hall*, 194 Ill. 2d at 350-51; *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 110 (cumulative errors that warrant extreme result of reversal and remand for new trial must themselves be extreme; short of this, cumulative error warranting reversal and remand will not be found).

¶ 93                                CONCLUSION

¶ 94        Accordingly, for all the foregoing reasons, we affirm the judgment of the trial court.

¶ 95        Affirmed.